**2022 IL 127253**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

---

(Docket No. 127253)

BYRON SIGCHO-LOPEZ, Appellant, v. THE ILLINOIS STATE
BOARD OF ELECTIONS *et al.*, Appellees.

*Opinion filed March 24, 2022.*

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.

Justices Garman, Michael J. Burke, and Carter concurred in the judgment and opinion.

Chief Justice Anne M. Burke and Justices Theis and Neville took no part in the decision.

**OPINION**

¶ 1    Byron Sigcho-Lopez, the alderman for Chicago's 25th Ward, filed a complaint with the Illinois State Board of Elections (Board), alleging that his predecessor's campaign committee, the 25th Ward Regular Democratic Organization

(Committee), unlawfully paid personal legal fees from campaign funds. The Board dismissed Sigcho-Lopez's complaint, and Sigcho-Lopez filed for administrative review in the appellate court. On administrative review, the appellate court affirmed the Board's dismissal. 2021 IL App (1st) 200561. This court allowed Sigcho-Lopez's petition for leave to appeal (Ill. S. Ct. R. 315 (eff. Oct. 1, 2020)), and for reasons other than those set forth by the Board and the appellate court, we affirm the appellate court's judgment and the Board's dismissal.

¶ 2                                    BACKGROUND

¶ 3        On July 20, 2000, the Committee (10 ILCS 5/9-1.9 (West 2000)) filed its statement of organization as required by section 9-3 of the Election Code (*id.* § 9-3) in order to support the candidacy for public office of Sigcho-Lopez's predecessor, Daniel Solis. When the Committee registered with the Board, Solis was listed as its chairman, and Grace Perales was listed as its treasurer.

¶ 4        In succeeding Solis as alderman of Chicago's 25th Ward, Sigcho-Lopez was sworn into that office on May 20, 2019. Solis did not seek reelection to retain his aldermanic position in 2019 or his Democratic committeeman position in 2020, and the last time he ran for office was in 2016 when he ran for committeeman. As of February 19, 2020, at a hearing before the Board, the Committee remained active.

¶ 5        Beginning in June 2016, while serving as alderman and Democratic committeeman of Chicago's 25th Ward, Solis began cooperating with the Federal Bureau of Investigation (FBI) and the United States Department of Justice (DOJ) in their investigation of alleged political corruption by Illinois public officials. Acting at the direction of the FBI and DOJ, he recorded conversations with other Illinois public officials. The Committee states in its brief that Solis's assistance contributed to the indictment of at least one public official and other individuals on federal corruption charges and that his assistance is ongoing.

¶ 6        When the FBI requested Solis's assistance, he retained the law firm of Foley & Lardner LLP. On May 21, 2019, the Committee paid $220,000 to Foley & Lardner LLP for legal fees the Committee states were related to Solis's cooperation with the FBI. On July 15, 2019, the Committee disclosed "legal fees" as an expenditure

in its quarterly report filed with the Board (10 ILCS 5/9-10(b) (West 2018)).

¶ 7                                   Board Proceedings

¶ 8         On October 17, 2019, Sigcho-Lopez filed a complaint with the Board alleging that "[t]he expenditure of May 21, 2019, in the amount of $220,000, to the law firm of Foley & Lardner LLP for the criminal defense of Daniel Solis against federal allegations of corruption" violated campaign disclosure and regulation provisions of the Election Code (*id.* § 9-8.10(a)(3)). In the complaint, Sigcho-Lopez alleged that the $220,000 payment by the Committee was "for a personal debt that [was] neither campaign-related nor for governmental or political purposes directly related to a candidate's or public official's duties and responsibilities." Sigcho-Lopez requested the Board to find that, by paying Solis's personal debt with campaign funds, the Committee had violated section 9-8.10(a)(3) of the Election Code (*id.*); to assess a $220,000 civil penalty against the Committee for the amount paid to Foley & Lardner LLP; and to levy a $500 fine on each of its officers, Solis and Perales, for knowingly making an expenditure in violation of section 9-8.10 of the Election Code (see *id.* § 9-8.10(b)).

¶ 9         On January 8, 2020, a closed preliminary hearing was held to determine whether the complaint had been filed on "justifiable grounds" such that the matter should proceed to a public hearing. See *id.* § 9-21. At the closed hearing before the Board's hearing officer, Sigcho-Lopez argued that, even if the use of campaign funds to pay for a politician's criminal defense constituted an "expenditure" as defined by section 9-1.5(A)(1) of the Election Code (*id.* § 9-1.5(A)(1) ("expenditure" is payment in connection with nomination for election, election, or retention of any person to or in public office)), it was nonetheless expressly prohibited as an expenditure for repayment of a personal debt pursuant to section 9-8.10(a)(3) of the Election Code (*id.* § 9-8.10(a)(3)).

¶ 10        The Committee countered that section 9-8.10(a) of the Election Code does not specifically prohibit the use of campaign money to pay for legal fees. See *id.* § 9-8.10(a). The Committee also contended that Solis's cooperation with the FBI rendered the legal fees an appropriate campaign expenditure and not a personal debt prohibited by section 9-8.10(a)(3) of the Election Code (*id.* § 9-8.10(a)(3)). According to the Committee, Solis's obligation to pay legal fees in relation to his

cooperation with federal authorities would not have existed irrespective of Solis's responsibilities as Chicago alderman and chair of the city council's zoning committee, and thus, the legal fees were not personal in nature. The Committee asserted that the FBI would not have sought Solis's cooperation if he had not held the official positions that provided the opportunity to communicate with other officials in whom they were interested.

¶ 11　　　The Committee noted that Solis had not been indicted or charged with any crime but that he was cooperating with the federal government. The Committee contended that Solis acted as "an officeholder in connection with the performance of governmental and public service functions" by cooperating and acting on behalf of the federal government in his official capacity and, thus, the expense for legal fees was appropriate pursuant to section 9-8.10(c) of the Election Code (*id.* § 9-8.10(c)).

¶ 12　　　On January 14, 2020, following the closed hearing, the hearing officer filed his written report containing suggested findings of fact and recommendations. Addressing whether the payment for Solis's legal defense was an expenditure as defined by section 9-1.5(A)(1) of the Election Code (*id.* § 9-1.5(A)(1)), the hearing officer concluded that "money spent on defenses as presented in this case can be an acceptable use of campaign funds." The hearing officer further stated that "[m]ore importantly, since [section 9-8.10(a) of the Election Code] does not contain a specific prohibition against using campaign funds for legal expenses, *** these types of expenditures can be made."

¶ 13　　　Addressing whether the payment of legal fees was prohibited as a payment for satisfaction or repayment of a personal debt, the hearing officer found that the word "debt" in section 9-8.10(a)(3) of the Election Code (*id.* § 9-8.10(a)(3)) refers only to a specific type of debt, *i.e.*, debt from personal loans, as identified in the subsection. Concluding that money spent on a legal defense is separate and different than debt related to personal loans, the hearing officer recommended that Sigcho-Lopez's complaint "be found not to have been filed on justifiable grounds and [that the] *** complaint be dismissed." On February 18, 2020, the Board's general counsel sent a memorandum to the Board in which he stated that he had reviewed the hearing officer's report and concurred with the recommendations contained therein.

¶ 14    On February 19, 2020, in the course of the Board's closed hearing, the Committee argued that the record revealed only that federal investigators directed Solis to wear a wire and take certain actions. The Committee asserted that nothing "is more of a public service function than [when] the FBI asks you to do something and you do it."

¶ 15    During the hearing, Board chair Charles W. Scholz asked acting general counsel Bernadette Matthews to confirm the Board policy on the expenditure of campaign funds for legal fees. Matthews responded that, although she had not previously dealt with a formal complaint, the payment of legal fees from campaign funds was questioned consistently and it was "just generally accepted as something that can be considered an expenditure." Matthews stated that two bills were before the General Assembly prohibiting the payment of legal fees from campaign funds to defend criminal charges. Board member William M. McGuffage stated that the expenditure of funds for a criminal defense was not prohibited under the Election Code because it was connected with Solis's position as a public official and related to his future candidacy. McGuffage believed that, although reprehensible, the payment of legal fees from campaign funds to defend criminal activity was not prohibited under the current legislation. Board member William R. Haine stated, "We don't have any authority to add to what the General Assembly says are the prohibited uses." Vice chair Ian Linnabary stated, "I find it absolutely reprehensible that a candidate can use [his] campaign fund to defer *** weekly expenses in association with criminal defense."

¶ 16    The Board nevertheless adopted the recommendation of the general counsel and hearing officer and found that the complaint was not filed on justifiable grounds. On March 19, 2020, after ratifying its decision, the Board issued its written final order adopting the recommendations of its general counsel and the hearing officer and dismissed Sigcho-Lopez's complaint.

¶ 17                              Appellate Court Proceedings

¶ 18    On March 25, 2020, Sigcho-Lopez filed a petition for administrative review of the Board's final order to the appellate court. *Id.* § 9-22. On April 9, 2021, the Appellate Court, First District, affirmed the Board's dismissal on administrative review. 2021 IL App (1st) 200561. The appellate court addressed, *inter alia*,

Sigcho-Lopez's argument that the Committee's payment of Solis's legal fees constituted a prohibited expenditure under section 9-8.10(a) of the Election Code. *Id.* ¶ 16. The appellate court noted that legal fees were not specifically included in section 9-8.10(a)'s list of 11 categories of expenditures that political committees were prohibited from paying from campaign funds. *Id.* The appellate court agreed with the Committee that the enumeration of exceptions in a statute is considered to be an exclusion of all other exceptions and, thus, the payment of legal fees by a political committee was not a *per se* prohibited expenditure. *Id.*

¶ 19        The appellate court then addressed whether the Committee's payment of Solis's legal fees was a prohibited expenditure under any of the enumerated categories set forth in section 9-8.10(a) of the Election Code. *Id.* ¶ 17. Specifically, the appellate court addressed the category of expenditures set forth in section 9-8.10(a)(3), noting that, "[c]onstrued literally, section 9-8.10(a)(3) appears to prohibit the satisfaction or repayment of all debts of every name and nature except those specifically exempted." *Id.* ¶ 18. Accordingly, the appellate court held that the language of section 9-8.10(a)(3) of the Election Code does not limit its proscription to the payment of personal loans, as the hearing officer had found. *Id.* ¶ 20. The appellate court noted that the second sentence of subsection (a)(3) of section 9-8.10 specifically prohibits the use of campaign funds to repay "personal loans" and would be rendered superfluous if the hearing officer's interpretation that the prohibition contained in the first sentence of subsection (a)(3) against a political committee's expenditure of funds in satisfaction or repayment of "any debts" refers only to the satisfaction or repayment of personal loans. *Id.* ¶ 22.

¶ 20        The appellate court further considered section 9-8.10(c) of the Election Code, which provides that "[n]othing in this Section prohibits the expenditure of funds of a political committee controlled by an officeholder or by a candidate to defray the customary and reasonable expenses of an officeholder in connection with the performance of governmental and public service functions" (10 ILCS 5/9-8.10(c) (West 2018)). 2021 IL App (1st) 200561, ¶ 21. The appellate court held that "[g]iving effect to both section 9-8.10(a)(3) and section 9-8.10(c)" leads to the conclusion that the prohibited "debt" in section 9-8.10(a)(3) refers to debt of a personal nature that does not defray the customary and reasonable expenses of an officeholder in connection with the performance of governmental and public service functions. *Id.*

¶ 21    To determine if debt is personal, the appellate court adopted the federal "irrespective test" set forth in the Federal Election Campaign Act (52 U.S.C. § 30114(b)(2) (2018) ("a contribution or donation shall be considered to be converted to personal use if the contribution or amount is used to fulfill any commitment, obligation, or expense of a person that would exist irrespective of the candidate's election campaign or individual's duties as a holder of [f]ederal office")). 2021 IL App (1st) 200561, ¶ 25. The appellate court held that because "[a]llegations of misconduct in the discharge of an officeholder's official duties would not exist independent of the individual's status as an elected official," "[t]he payment of legal fees incurred in defense of such allegations by a political committee can, therefore, qualify as an expenditure to defray a reasonable expense of an officeholder in connection with the performance of a governmental function as permitted pursuant to section 9-8.10(c) of the campaign disclosure statute." *Id.* ¶ 27.

¶ 22    Thus, the appellate court concluded that "the dismissal of Sigcho-Lopez's complaint and the findings of the hearing officer supporting that dismissal *** [were] not clearly erroneous, and as a consequence, *** affirm[ed] the Board's final order, dismissing Sigcho-Lopez's complaint." *Id.* ¶ 31. On September 29, 2021, this court allowed Sigcho-Lopez's petition for leave to appeal. Ill. S. Ct. 315 (eff. Oct. 1, 2020).

¶ 23                                    ANALYSIS

¶ 24    "Pursuant to article III, section 5, of the Illinois Constitution of 1970, the Board has general supervision of Illinois's election laws." *Cooke v. Illinois State Board of Elections*, 2021 IL 125386, ¶ 48. Any person may file a verified complaint with the Board alleging a campaign finance violation under the Election Code. 10 ILCS 5/9-20 (West 2018). Upon receipt of the complaint, the Board must hold a closed preliminary hearing to determine whether the complaint appears to have been filed on justifiable grounds, and the Board "shall dismiss the complaint without further hearing" if it "fails to determine that the complaint has been filed on justifiable grounds." *Id.* § 9-21.

¶ 25    The purpose of a closed preliminary hearing is to elicit evidence on whether the complaint was filed on justifiable grounds and has some basis in fact and law. 26

Ill. Adm. Code 125.252 (2018). The complainant bears the burden of introducing sufficient evidence or information for the Board to conclude that the complaint has been filed on justifiable grounds. 26 Ill. Adm. Code 125.252(c)(4) (2018). The justifiable grounds standard focuses on the factual and legal sufficiency of the complaint, and "[t]he essential inquiry is whether the complaint is factually and legally justified." *Cook County Republican Party v. Illinois State Board of Elections*, 232 Ill. 2d 231, 245 (2009).

¶ 26 Any party adversely affected by a judgment of the Board may obtain judicial review directly in the appellate court for the district in which the cause of action arose, and such judicial review shall be governed by the provisions of the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2018)) and its accompanying rules. 10 ILCS 5/9-22 (West 2018). The determination of whether a complaint has been filed on justifiable grounds presents a mixed question of fact and law and is reviewed for clear error. *Cook County Republican Party*, 232 Ill. 2d at 245. The Board's decision will be deemed clearly erroneous where the record leaves the reviewing court with the definite and firm conviction that the Board committed a mistake. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 211 (2008).

¶ 27 "Although this case is before this court following review in the appellate court, we are reviewing the Board's decision and not that of the appellate court." *Cooke*, 2021 IL 125386, ¶ 48. Before addressing the Board's application of the relevant statutory provisions to the established facts, we must interpret the relevant statutory provisions. *Id.* ¶ 51. "When determining how the Election Code should be construed, we employ the same basic principles of statutory construction applicable to statutes generally." *Jackson-Hicks v. East St. Louis Board of Election Commissioners*, 2015 IL 118929, ¶ 21. The primary objective of statutory construction is to ascertain and give effect to the legislature's intent, and the most reliable indicator of legislative intent is the language of the statute, given its plain and ordinary meaning. *Maksym v. Board of Election Commissioners*, 242 Ill. 2d 303, 318 (2011); *County of Du Page v. Illinois Labor Relations Board*, 231 Ill. 2d 593, 603-04 (2008). Where the statutory language is clear and unambiguous, we will enforce it as written and will not read into it exceptions, conditions, or limitations that the legislature did not express. *In re Christopher K.*, 217 Ill. 2d 348, 364 (2005).

¶ 28    In construing a statute, a court must not focus exclusively on a single sentence or phrase but must view the statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation. *Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617, ¶ 26. "Each word, clause[,] and sentence of a statute must be given a reasonable meaning, if possible, and should not be rendered superfluous." *Id.* In addition to the statutory language, the court may consider the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another. *County of Du Page*, 231 Ill. 2d at 604. Also, a court presumes that the legislature did not intend absurd, inconvenient, or unjust results. *Bank of New York Mellon v. Laskowski*, 2018 IL 121995, ¶ 12.

¶ 29    "We *** keep in mind the subject addressed by the statute and the legislature's apparent intent in enacting it," and the legislature's intent in enacting the campaign disclosure and regulation provisions of the Election Code is " 'to preserve the integrity of the electoral process by requiring full public disclosure of the sources and amounts of campaign contributions and expenditures.' " *Cooke*, 2021 IL 125386, ¶ 52 (quoting *Sorock v. Illinois State Board of Elections*, 2012 IL App (1st) 112740, ¶ 2). Article 9 of the Election Code governs the disclosure and regulation of campaign contributions and expenditures. 10 ILCS 5/art. 9 (West 2018). Section 9-1.5(A)(1) of the Election Code defines "expenditure" to mean, *inter alia*:

> "(1) a payment, distribution, purchase, loan, advance, deposit, gift of money, or anything of value, in connection with the nomination for election, election, or retention of any person to or in public office or in connection with any question of public policy." *Id.* § 9-1.5(A)(1).

¶ 30    Thus, an expenditure, which a Committee pays from campaign funds and discloses pursuant to the Election Code (*id.* § 9-10), must be a payment "in connection with the nomination for election, election, or retention of any person" (*id.* § 9-1.5(A)(1)). The Board was therefore tasked with, among other things, determining whether the Committee's payment of Solis's legal fees was in

connection with his nomination for election, election, or retention to or in public office.[1]

¶ 31    Likewise, section 9-8.10(a) of the Election Code prohibits the use of a political committee's funds for personal matters that are neither campaign related nor for governmental or political purposes related to a candidate's or public official's duties and responsibilities. *Id.* § 9-8.10(a) (political committee shall not use campaign funds to repay personal loans, for the satisfaction of any debts or payment of any expenses relating to a personal residence, for clothing or personal laundry expenses, for personal travel expenses, for an individual's tuition, or for payments to the public official or candidate). In other words, the campaign disclosure and regulation provisions of the Election Code consistently reveal the legislative intent to preclude payments from campaign funds for merely personal use. See *id.*

¶ 32    In the present case, we decline to adopt the Committee's argument that the payment of criminal defense fees from campaign funds is in all circumstances consistent with the Election Code because the General Assembly declined to specifically designate criminal defense fees as a prohibited expenditure under section 9-8.10(a) of the Election Code. See *id.* (specifically prohibiting expenditures in violation of law, in excess of fair market value of services, for satisfaction or repayment of debts, for the payment of any expenses relating to a personal residence, for clothing or personal laundry expenses, for personal travel expenses, for health club dues, etc.). The Committee asserts that we must apply the maxim *expressio unius est exclusio alterius*, which means that "the enumeration of an exception in a statute is considered to be an exclusion of all other exceptions." *Schultz v. Performance Lighting, Inc.*, 2013 IL 115738, ¶ 17. The Committee contends that Sigcho-Lopez asks this court to read into section 9-8.10(a) a prohibited category that simply does not exist.

---

[1]The Committee asserts that, by failing to argue it in this court, Sigcho-Lopez has waived the argument that personal legal fees are not an "expenditure" as defined by the Election Code. However, the rule of waiver is a limitation on the parties, not on the courts, and a reviewing court can, in furtherance of its responsibility to provide a just result, override considerations of waiver. *In re Madison H.*, 215 Ill. 2d 364, 371 (2005). Moreover, we must view the statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation. *People v. Jackson*, 2011 IL 110615, ¶ 12.

¶ 33    However, this court has explained:

"[T]he principle that the expression of one thing in a statute excludes any other thing is only a rule of statutory construction, not a rule of law. It is merely a rule that courts use to help them ascertain the intent of the legislature where such intent is not clear from the statute's plain language. The maxim is applied only when it appears to point to the intent of the legislature, not to defeat the ascertained legislative intent. The rule may be overcome by a strong indication of legislative intent." *Bridgestone/Firestone, Inc. v. Aldridge*, 179 Ill. 2d 141, 153-54 (1997).

¶ 34    In this case, we find that the maxim is overcome by a strong indication of legislative intent, pursuant to the statute's plain language, including the remaining language of section 9-8.10, in particular the language of section 9-8.10(a)(3) in correlation with section 9-8.10(c). See 10 ILCS 5/9-8.10(a)(3), (c) (West 2018); see also *Lay*, 2013 IL 114617, ¶ 26 (in construing a statute, court must view statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation). Section 9-8.10(a)(3) prohibits a political committee from making expenditures "[f]or satisfaction or repayment of any debts other than loans made to the committee" or on behalf of the committee or "repayment of goods and services purchased by the committee under a credit agreement." 10 ILCS 5/9-8.10(a)(3) (West 2018); Merriam-Webster's Collegiate Dictionary 320 (11th ed. 2003) ("debt" defined as "something owed"). Section 9-8.10(a)(3) further provides that "[n]othing in this Section authorizes the use of campaign funds to repay personal loans." 10 ILCS 5/9-8.10(a)(3) (West 2018). Moreover, section 9-8.10(c) of the Election Code provides:

"Nothing in this Section prohibits the expenditure of funds of a political committee controlled by an officeholder or by a candidate to defray the customary and reasonable expenses of an officeholder in connection with the performance of governmental and public service functions." *Id.* § 9-8.10(c).

¶ 35    Here, we partially adopt the reasoning of the appellate court and hold that section 9-8.10(a)(3) (*id.* § 9-8.10(a)(3)) prohibits an expenditure for satisfaction or repayment of a personal debt that does not defray the customary and reasonable expenses of an officeholder in connection with the performance of governmental and public service functions (*id.* § 9-8.10(c)). 2021 IL App (1st) 200561, ¶ 21.

Whether legal defense fees amount to a personal debt that does not defray the customary and reasonable expenses of an officeholder in connection with the performance of governmental and public service functions must be evaluated on a case-by-case basis.

¶ 36     In the case *sub judice*, the parties ostensibly agree that campaign fund payments expended for personal use are prohibited by the Election Code. Sigcho-Lopez argues that legal fees expended for the criminal defense of public corruption charges amount to personal debt prohibited as a campaign fund expenditure, and the Committee argues that legal fees expended for the criminal defense of public corruption charges are not personal in nature because the public corruption charges would not exist irrespective of the public official's position.

¶ 37     Following the Committee's proposal to determine if its expenditure amounts to a prohibited personal debt, the appellate court adopted the federal "irrespective test" developed by the Federal Election Commission (FEC) for federal candidates and later codified into federal law. The "irrespective test" was applied in *Federal Election Comm'n v. Craig for U.S. Senate*, 816 F.3d 829, 832 (D.C. Cir. 2016), where the United States Court of Appeals addressed the FEC's allegations that a former senator, his campaign committee, and the committee's treasurer converted campaign funds to the senator's personal use in violation of the Federal Election Campaign Act of 1971 (52 U.S.C. § 30101 *et seq.* (2006)).

¶ 38     The FEC had concluded that campaign funds disbursed by the senator to his attorneys to overturn his convictions of disorderly conduct and interference with privacy were similar to legal expenses associated with a divorce or driving while under the influence of alcohol, would exist irrespective of the officeholder's status, and constituted an impermissible personal use of campaign funds, even though the underlying proceedings may have impacted the officeholder's status. *Craig*, 816 F.3d at 838; see *id.* at 834 (FEC had determined that legal fees incurred in connection with Senate Ethics Committee's inquiry and for public relations fees incurred in responding to press inquiries were not incurred irrespective of the senator's campaign or official duties and were therefore permissible). The federal court of appeals in *Craig* agreed, concluding that the legal fees expended to withdraw the guilty plea would have existed irrespective of the senator's reelection campaign or official duties and, thus, the appellants violated 52 U.S.C. § 30114(b)

when they used campaign committee funds to pay for the legal fees incurred in pursuing withdrawal of the plea. *Craig*, 816 F.3d at 839.

¶ 39     The "irrespective test" applied in *Craig* mirrored the language of the federal statute. See *id.* ("FEC's focus on the allegations of the legal proceedings fits well with the irrespective definition embodied in the statutory language"); 52 U.S.C. § 30114(b)(2) (2012) (contributions are converted to personal use if used to fulfill expense of a person that would exist "irrespective" of the candidate's election campaign or individual's duties as office holder). However, the plain language of the Illinois statute at issue here does not include "irrespective" language or an "irrespective test." Accordingly, although we adopt the appellate court's plain-language construction of section 9-8.10(a)(3) and 9-8.10(c) of the Election Code, we reject the appellate court's adoption of the federal "irrespective test" as applied to federal election law. We instead apply the plain language of the relevant campaign disclosure and regulation provisions of Illinois's Election Code.

¶ 40     In doing so, we reject the Committee's argument that legal fees incurred as a result of public corruption and criminal activity, resulting in conviction even, may be subsidized by campaign funds because they are not personal debt incurred irrespective of the officeholder's position. We cannot ignore that a public official's actions that result, for example, in convictions of official misconduct or corruption are "clearly committed for their own interests." See *Wright v. City of Danville*, 174 Ill. 2d 391, 406 (1996) ("[a] conviction for corrupt practices establishes that a public official exploited his fiduciary position for his personal benefit"). The essence of a conviction for official misconduct, conflict of interest, or public corruption is that the public official has attempted "to personally enrich himself or another by an act exceeding his lawful authority as a public servant." (Internal quotation marks omitted.) *Id.* at 406-07 (although public officials' employment provided opportunity for misconduct, "by no stretch of the imagination could their actions be deemed an extension of their legitimate functions as elected officials").

¶ 41     Moreover, considering the plain language of the campaign disclosure and regulation provisions of the Election Code, we also reject the contention that, because an officeholder could not engage in public corruption absent his position as officeholder, his personal legal defense fees for proven official misconduct or public corruption may be subsidized by campaign funds as an expenditure "to

defray the customary and reasonable expenses of an officeholder in connection with the performance of governmental and public service functions." 10 ILCS 5/9-8.10(c) (West 2018); see *In re Toney*, 2012-1887, p. 3 (La. App. 1 Cir. 5/30/14); 145 So. 3d 1043, 1049-50 (any use by sheriff of campaign funds for the defense of his criminal indictment following a guilty plea is prohibited under campaign finance disclosure statute as unrelated to the holding of a public office).

¶ 42    This court has never condoned public corruption. See *Peabody v. Sanitary District of Chicago*, 330 Ill. 250, 261 (1928) (statute should be construed broadly to prohibit corrupt practices by public officers, state or local, holding office by election or appointment); *Cook v. Shipman*, 24 Ill. 614, 616 (1860) ("When official corruption can go unwhipt of justice, and when it may with impunity stalk forth in open day, with its hideous and monstrous form appearing through its transparent covering, and when courts shall cease to employ every power that the law has conferred upon them, to inflict the severest penalties it has denounced against such crime, then organized society is ready to dissolve, and governments cease to exist.").

¶ 43    Accordingly, we find compelling the New Jersey Supreme Court's response when faced with a similar issue. In holding that the payment of legal fees from campaign funds to defend against an indictment alleging official corruption was not an ordinary and necessary expense of holding public office, the New Jersey Supreme Court stated the following:

> "Despite blaring headlines that announce the most recent prosecution and conviction of a public official, we have yet to reach the point when it can be said that defending against a federal or state criminal indictment alleging corrupt practices is an 'ordinary' expense of holding public office. A grand jury indictment is not a customary, or usual, or normal incident of holding public office, nor does it occur in the regular course of events. The vast majority of elected public officials carry out their duties honestly and honorably and will not, in the course of their long careers, be the target of a criminal prosecution. We cannot conclude that the Legislature intended that defending against a federal or state criminal indictment would be an ordinary incident of holding public office, or that the use of campaign funds to cover such defense costs would be an 'expense that *reasonably* promotes or carries out the

responsibilities of a person holding elective public office,' *N.J.A.C.* 19:25-6.7(a)." (Emphasis in original.) *In re Election Law Enforcement Comm'n Advisory Opinion No. 01-2008*, 989 A.2d 1254, 1259-60 (N.J. 2010).

This court agrees. Allowing campaign monies to subsidize public corruption amounts to an unreasonable interpretation of the Election Code.

¶ 44        On the other hand, we also reject Sigcho-Lopez's contention that legal fees incurred to pay for a public official's criminal defense against investigations or charges of public corruption amount to a *per se* prohibited personal debt pursuant to the plain language and spirit of section 9-8.10(a)(3) of the Election Code (10 ILCS 5/9-8.10(a)(3) (West 2018). We cannot ignore that not all allegations by political rivals are sound and that baseless allegations are at times asserted against public officials because of their very capacity as public officials. See *Williams v. Graves County*, No. 5:21-CV-21-TBR, 2021 WL 2828517 (W.D. Ky. July 6, 2021) (plaintiff's civil Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1962 (2018)) allegations were conclusory and unsupported by specific plausible factual allegations supporting a claim for any of the predicate offenses); *Green v. William*, No. 1:17-cv-266-PLR-SKL, 2017 WL 6892910 (E.D. Tenn. Dec. 15, 2017), *report and recommendation adopted*, No. 1:17-cv-00266, 2018 WL 387630 (E.D. Tenn. Jan. 11, 2018) (complaint's rambling allegations mentioning, among other things, extortion and bribery by public officials failed to show entitlement to relief); *Huffmaster v. Foster*, 565 F. Supp. 2d 693, 698 (S.D. Miss. 2008) (allegations by politician that other members of his political party committed acts of mail fraud, wire fraud, and bank fraud were insufficient in that politician's complaint did not specifically identify anything any of the defendants was alleged to have done to support the claims); *Hawkins v. Schirack*, 659 F. Supp. 1, 3 (N.D. Ohio 1986) (because routine check would have disclosed no basis in fact for public official's suspected involvement in illegal contract allegations but would have disclosed that the amended complaint was filed for harassment purposes by political rival, public official was entitled to award of reasonable attorney fees).

¶ 45        In such a case, the payment of legal defense fees from campaign funds may be appropriately considered as a payment "in connection with the nomination for election, election, or retention of any person to or in public office" (10 ILCS 5/9-1.5(A)(1) (West 2018)) and, although personal debt, "the expenditure of funds of a

political committee *** to defray the customary and reasonable expenses of an officeholder in connection with the performance of governmental and public service functions" (*id.* § 9-8.10(c)). Therefore, in limited circumstances, pursuant to the plain language of the campaign disclosure and regulation provisions of the Election Code, the Board may appropriately allow the use of campaign funds to pay for legal expenses in defending such allegations. See *Wright*, 174 Ill. 2d at 404 (holding ordinance invalid to the extent it attempted to indemnify officials convicted of crimes for their attorney fees and costs incurred in their unsuccessful criminal defense but making no express determination regarding the authority of any municipality or home rule unit to indemnify its officers and employees for legal expenses incurred in a successful defense); see also *State v. Ferguson*, 709 N.E.2d 887 (Ohio 1998) (although public officeholder may generally not use campaign funds to pay for legal defense against criminal charges, use of campaign funds to pay attorney fees incurred in connection with dismissed indictment that failed to state prosecutable violation was not prohibited attorney fees).

¶ 46      Until the General Assembly amends the statute to, for example, specifically prohibit payment from campaign funds for legal fees incurred in defense of criminal allegations against a public official or candidate, the issue requires the Board's consideration on a case-by-case basis, applying the plain language of the applicable statutory provisions. In this case, despite the parties' arguments regarding legal defense fees incurred as a result of public corruption allegations, the record here reveals that Solis had not been indicted on criminal charges but only that he had worked with federal investigators using his official capacity to expose public corruption. Considering the evidence before the Board, we find that the Board's conclusion—that Solis's legal fees amounted to a proper expenditure not prohibited as "satisfaction or repayment" of a personal debt (10 ILCS 5/9-8.10(a)(3) (West 2018)) but incurred "to defray the customary and reasonable expenses of an officeholder in connection with the performance of governmental and public service functions" (*id.* § 9-8.10(c))—was not clearly erroneous. Thus, we affirm the Board's decision, finding that the complaint was not factually and legally justified.

¶ 47                             CONCLUSION

¶ 48        For the foregoing reasons, we affirm the judgment of the appellate court, and
we affirm the Board's decision to dismiss Sigcho-Lopez's complaint.


¶ 49        Appellate court judgment affirmed.

¶ 50        Board decision affirmed.


¶ 51        CHIEF JUSTICE ANNE M. BURKE and JUSTICES THEIS and NEVILLE
took no part in the consideration or decision of this case.